IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| ALBERT G. MATHEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. CIV-05-952-L |
| | ) | |
| JO ANNE B. BARNHART, | ) | |
| Commissioner, Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

Albert G. Mathey ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405 (g) seeking judicial review of Defendant Commissioner's final decision denying Plaintiff's application for disability insurance benefits under the Social Security Act. This matter has been referred to the undersigned Magistrate Judge for proceedings consistent with 28 U.S.C. § 636(b)(1)(B). Upon review of the pleadings, the record ("Tr.") and the parties' briefs, the undersigned recommends that the Commissioner's decision be reversed and the matter remanded for further proceedings.

## Administrative Proceedings

Plaintiff initiated these proceedings by filing an application seeking disability insurance benefits in December, 2001, alleging that he has a difficult time learning and understanding job responsibilities as a result of a learning disability, a speech impediment, glaucoma and seizures [Tr. 54 - 56 and 71]. He claimed that these limitations became disabling as of June 1, 2000. *Id.* Plaintiff's claims were denied initially and upon reconsideration [Tr. 32 - 34 and 37 - 38]; at Plaintiff's request, an

Administrative Law Judge ("ALJ") conducted a November, 2003, hearing where Plaintiff, who was represented by counsel, and a vocational expert testified [Tr. 39 and 211 - 251]. In his November, 2004, decision the ALJ found that Plaintiff was not disabled because he had engaged in substantial gainful activity after the date of his alleged onset of disability and because he was able to perform his past relevant work [Tr. 16 - 25]. The Appeals Council of the Social Security Administration declined Plaintiff's review request, and Plaintiff subsequently sought review of the Commissioner's final decision in this court [Tr. 4 - 7].

## Standard of Review

This court is limited in its review of the Commissioner's final decision to a determination of whether the ALJ's factual findings are supported by substantial evidence in the record and whether the correct legal standards were applied. *Doyal v. Barnhart*, 331 F.3d 758, 760 (10th Cir. 2003). Nonetheless, while this court can neither reweigh the evidence nor substitute its own judgment for that of the ALJ, the court's review is not superficial. "To find that the [Commissioner's] decision is supported by substantial evidence, there must be sufficient relevant evidence in the record that a reasonable person might deem adequate to support the ultimate conclusion." *Bernal v. Bowen*, 851 F.2d 297, 299 (10th Cir. 1988) (citation omitted). "A decision is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it." *Id.* at 299.

## Determination of Disability

The Social Security Act defines "disability" as the "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C.§§423(d)(1)(A). The Commissioner applies a five-step inquiry to determine whether a claimant is disabled. See 20 C.F.R. §404.1520(b)-(f); *see also Williams v. Bowen*, 844 F.2d 748, 750-752 (10th Cir. 1988) (describing five steps in detail). The Plaintiff bears the initial burden of proving that he has one or more severe impairments. 20 C.F.R. § 404.1512; *Turner v. Heckler*, 754 F.2d 326, 328 (10th Cir. 1985). Where Plaintiff makes a prima facie showing that he can no longer engage in prior work activity, the burden of proof shifts to the Commissioner to show that Plaintiff retains the capacity to perform a different type of work and that such a specific type of job exists in the national economy. *Turner*, 754 F.2d at 328; *Channel v. Heckler*, 747 F.2d 577, 579 (10th Cir. 1984). In this case, the ALJ determined that Plaintiff was engaging in substantial gainful activity and that he was capable of performing his past relevant work, ending the sequential inquiry at the fourth step.

## Plaintiff's Claims of Error

Plaintiff claims, first, that the Commissioner erred in finding that work performed by Plaintiff after his alleged onset of disability date was substantial gainful activity. Secondly, Plaintiff maintains that the Commissioner failed to develop the record with regard to whether Plaintiff's mental impairment meets the criteria of Listing 12.05C.[1] Finally, Plaintiff alleges that the Commissioner erred in his assessment of Plaintiff's

---

[1]*See* 20 C.F.R. Part 404, Subpart P, Appendix 1, Part A.

residual functional capacity ("RFC").[2]

Because Plaintiff's focus on appeal is on his alleged mental impairment, the following synopsis of the ALJ's decision will not include the details of the medical evidence pertaining to his physical impairments.

## The ALJ's Decision and the Evidence of Record

The ALJ initially determined that Plaintiff – fifty-two years old with a high school education and with work experience as a nursing home housekeeper, assembly line worker and a meat cutter – had engaged in what "appears to have been substantial gainful activity" [Tr. 17] since June 1, 2000, his alleged onset of disability date [Tr.16 - 17]. While a finding of non-disability could have been made on this basis alone,[3] the ALJ noted that "[i]n any event, the claimant retains the residual functional capacity to perform past relevant work" [Tr. 17] and proceeded with the sequential analysis, finding that Plaintiff suffered from the following impairments: learning disorder; history of hypoxic encephalopathy without indication of stroke, subdural or hydrocephalus; history of seizure disorder; glaucoma; status post corneal transplant with early cataract formation in both eyes; sleep apnea; hypertension; history of neck pain, right knee injury, and back pain of short duration; history of cellulitis; and a history of cold symptoms [Tr. 17 - 18]. These impairments – singly or in combination – were further found to be severe but not severe enough to meet or equal the criteria for any listed impairment. [Tr. 18].

In connection with Plaintiff's alleged mental impairment, the ALJ noted an

---

[2]Residual functional capacity "is the most [a claimant] can still do despite [a claimant's] limitations." 20 C.F.R. § 404.1545 (a) (1).

[3]*See* 20 C.F.R. § 404.1571.

4

examination by Juan Villazon, M.D., a neurologist, during the course of Plaintiff's

October, 2001, hospitalization with pneumonia [Tr. 20 and 136 - 137].  Plaintiff was

referred to Dr. Villazon as a result of a grand mal seizure suffered while in intensive care

[Tr. 136].  Dr. Villazon's report states that

> [Plaintiff] has a background history of learning and speech disorder with
> stuttering. According to his brother he had some difficulties at birth and
> apparently had hypoxic encephalopathy with mild developmental delay.
> He had no neurological sequela from that other than mild difficulty
> learning especially with numbers.

*Id.* The report further states that the  neurological "examination reveals an abnormal

mental status." *Id.*  Dr. Villazon's clinical impression was that

> [Plaintiff's] mental status reveals some difficulties with memory and
> attention, concentration and computations.  This appears to be premorbid
> finding as he has a history of learning and speech disability during
> childhood . Because of this history he could have primary seizure disorder
> secondary to hypoxic damage of the brain at birth.

[Tr. 137].

The ALJ then observed that the records of Plaintiff's primary care physician –

covering a period from October 3, 1997, through June 3, 2003 – contain no diagnosis of

mental impairment or cognitive disorder nor any suggestion of referral for the

evaluation/treatment of a mental impairment [Tr. 20].   After reiterating that Plaintiff's

brother reported only mild developmental delay and mild learning difficulties, the ALJ

found that at the hearing, Plaintiff "was able to adequately understand the questions

presented to him and accurately recall and explain historical events related to his

medical history." *Id.*  The ALJ concluded that the evidence fails to establish that Plaintiff

has more than mild, if any, difficulty with activities of daily living or maintaining social

functioning and more than mild to moderate difficulty in maintaining concentration, persistence or pace [Tr. 20 - 21].

In his assessment of Plaintiff's credibility, the ALJ found that Plaintiff's claims with regard to his impairments and the impact of those impairments on his ability to work were neither supported by the preponderance of medical evidence nor were they otherwise wholly credible [Tr. 21].  The ALJ specifically pointed to the fact that notwithstanding Plaintiff's claim that he was unable to work as of June 1, 2001, his earnings records indicated his continued employment as a janitor at Ayers Nursing Home.[4]  *Id.*  As described by the ALJ, Plaintiff's current seven and one half hour per day job at the nursing home consists of filling lunch trays on carts and helping to feed patients; he then refills water cups, passes out hanging clothes, refills and distributes dinner carts and trays and, finally, cleans two dining rooms [Tr. 21 - 22].  The ALJ stated that Plaintiff admitted that he can do his required work but was slow in his first job assignment with the nursing home - housekeeping.  *Id.*

Next, the ALJ addressed the evidence proffered by Plaintiff's counsel to establish that Plaintiff's work at the nursing home is accommodated work and does not constitute substantial gainful activity [Tr. 22].  Because the ALJ's findings on this issue are determinative of the undersigned's recommendation for reversal and remand, they will be quoted in their entirety:

> In a "To Whom it May Concern" statement (undated), Mike Ayers, reported that the claimant "most recently" began working at Ayers Nursing Home,

---

[4]Plaintiff earned $10,177.74 in 2000, $9,279.27 in 2001, $11,082.81 in 2002, and $10,974.60 in 2003 [Tr. 21].

Inc. on August 1, 2000, and stated, "Albert is a very friendly person and is liked by everyone. However, Albert has difficulty learning tasks, and his ability to perform jobs has diminished. We have been employing Albert because he would be unable to acquire employment elsewhere, and we feel that we have the social responsibility to see that he can provide for himself" (Exhibit 7E, p.2). Notably, it is not entirely clear what Mr. Ayers means in saying that the claimant's ability to perform jobs has diminished. Certainly, there is no indication in the medical evidence of record that the claimant's functional capacity has "diminished." Further, in an unattested "Work Activity Questionnaire," it is indicated that the claimant's work is not considered to be fully worth the amount paid (Exhibit 7E, p. 1). Rather, it is indicated that the claimant's work is worth less than 50 percent (of the amount paid). However, there was no attempt to explain how such figure (of 50 percent) was reached, as requested.   Rather, of the following statement was provided: "Albert is a very good person and he tries hard, but he is slow to learn jobs. Some jobs he never mastered. We had to give him fewer and easier duties. We had to staff extra help when he worked in order to get his duties done. He cannot handle many tasks. Any changes confuse him." The undersigned notes that rather than explaining how the estimate of the value of the claimant's work was reached, such statement actually, in effect, constitutes an enumeration of some of the "special considerations" granted to the claimant in order to allow him to work that was requested on said "Work Activity Questionnaire" as an alternative to providing an estimate of the value of the claimant to work product. However, in connection with said alternative, an explanation of the same was likewise requested, but there was no explanation regarding in what respect the claimant's duties were "fewer and easier," or what the "extra help," in the form of staffing, was/were required to do in order to assist the claimant. Without such explanation, the bare assertion that the claimant's work was worth less than 50 percent of the amount paid or that claimant's duties were "fewer and easier," and that "extra help," in the form of staffing, was/were required in order to assist the claimant is essentially unsupported.

From the claimant's testimony, there is no indication that the claimant required special transportation, less hours, more rest periods, frequent absences and/or special equipment. Also, there does not appear to have been an intimation at the hearing that the claimant's 7 ½ hour workday from noon to 8:00 PM[5] (apparently with a ½ hour lunch break) constituted

---

[5]Plaintiff testified about his hours of work as follows:

ALJ:   Okay. What time do you normally get there?

(continued...)

irregular hours or fewer hours.   Furthermore, although the claimant's employer apparently has asserted that the claimant required fewer or easier duties and extra help, which could also be construed to infer lower production on the part of the claimant, the same is not supported by the claimant's testimony.   Rather, the claimant testified that he is able to keep up with his current work and that he had not been admonished by his supervisors that he needed to speed up or do something differently, which incidentally tends to indicate that extra supervision also was not required by the claimant.   Furthermore, the claimant did not testify as to the necessity of other individuals to assist him in his appointed tasks.   For all of the foregoing reasons, the undersigned is not convinced that the claimant's work that Ayers Nursing Home is significantly accommodated.

Clearly, the claimant's current employer appears to like the claimant and is predisposed to accommodate the claimant.   However, it is not so clear that the accommodation actually provided to the claimant is not in the form

---

[5](...continued)

| | |
|---|---|
| PLT: | I get there around 12:30. |
| ALJ: | That's in the afternoon? |
| PLT: | Yeah - - in the morning. |
| ALJ: | Oh, in the morning? |
| PLT: | Yes, sir. |
| ALJ: | Oh, okay. You - - |
| PLT: | Until eight at night. |
| ALJ: | Until eight? |
| PLT: | Yes, sir. |
| ALJ: | Now, no, you get there, what, at midnight? |
| PLT: | No, in the - - A.M. |
| ALJ: | A.M.? |
| PLT: | In the morning. |
| ALJ: | Right early in the morning - |
| PLT: | And then I get off at eight at night. |
| ALJ: | Okay. |
| PLT: | Eight P.M. I get off. |
| ATTY: | Twelve noon. |
| PLT: | Yeah, 12 noon. |
| ALJ: | Oh, 12 noon. |
| PLT: | I, I'm sorry, 12 noon. |
| ALJ: | Oh, 12 noon, okay. |
| PLT: | Twelve noon, I'm sorry - |
| ATTY: | He's calling it the wrong thing. |
| ALJ: | Yeah, oh - - |
| PLT: | Twelve noon. |

[Tr. 224 - 225].

8

of exaggerating the degree of problems the claimant has in performing his work.  The undersigned is persuaded that the claimant might have some difficulty in learning more complex tasks.  However, the evidence indicates that the claimant was able to learn how to do even skilled tasks, such as are involved in meat cutting (SVP 6), which work, by his own report, he performed for over 25 years.  Therefore, the suggestion that the claimant's ability to perform basically unskilled work is limited by 50 percent, or more, is not credible.

[Tr. 22 - 23].

Returning to the specific topic of Plaintiff's credibility, the ALJ noted Plaintiff admitted that he completed high school without the benefit of special education although he testified that he was slow in catching on to the lessons; he obtained a drivers' license when he was sixteen[6] [Tr. 23].  After completing high school, Plaintiff worked as a meat cutter for twenty-six years,[7] a job which is described as skilled work in the *Dictionary of Occupational Titles.*[8] *Id.*  The ALJ further noted that Plaintiff was regularly involved with church activities, serving on the administrative Board of Directors for the Methodist Church, as well as the finance committee.[9] *Id.*  The ALJ found that these activities were

---

[6]Plaintiff testified that he graduated in May, 1970, from high school in Mountain Park, Oklahoma – a school that later consolidated with the Snyder system – as one of seventeen students [Tr. 216 - 217]. No special education classes were offered [Tr. 217].  He received his driver's license on his third attempt. *Id.*

[7]Plaintiff testified that he worked for his family at their grocery store in Mountain Park [Tr. 219] and that "the guy that worked for my dad showed me how to become a meat cutter." [Tr. 220].  He was let go from his work as a meat cutter after the store was sold [Tr. 239]; he was fired from his next job – putting shavings in ankle weights – after a little more than six months [Tr. 239 - 240]; and, was laid off from his work sweeping floors at Bar S, again after around six months [Tr. 241 - 242].

[8]The *Dictionary of Occupational Titles* or "DOT" as published by the Department of Labor is one of several publications from which the Social Security Administration "will take administrative notice of reliable job information."  20 C.F.R. § 404.1566 (d) (1).

[9]According to Plaintiff's testimony, his church is "pretty small." [Tr. 235].  With respect to Plaintiff's work on the finance committee, it is worth noting that in caring for his personal finances, Plaintiff signs his name on his checks and his sister takes care of filling out the remaining portions and maintaining his bank
(continued...)

not consistent with Plaintiff's alleged degree of limitations and concluded that Plaintiff had exaggerated his symptoms; he determined that Plaintiff could perform a full range of medium work and was able to follow basic instructions, was able to communicate and follow instructions of supervisors, and was able to maintain persistence and pace to a moderate level [Tr. 23 - 24].

Based upon the testimony of the vocational expert, the ALJ found that Plaintiff could return to his past relevant work as an industrial cleaner, a production assembler, and/or a tray worker/housekeeping cleaner [Tr. 24]. Consequently, Plaintiff was not disabled within the meaning of the Social Security Act. *Id.*

## Additional Background

In order for the court to have a complete understanding of this record, it is important to note that Plaintiff's counsel made several requests for a consultative examination in order to measure Plaintiff's IQ and to evaluate the extent of Plaintiff's alleged learning disability [Tr. 215]. When the request for an examination was renewed at the end of the hearing, the ALJ made the following statement:

ATTY:        . . . I'm requesting a consultative examination. It's - -

ALJ:         Well, there's a lot of things - - as you all know, we're all in the
             same page, trying to do the right thing.

ATTY:        Right.

ALJ:         I'll just give you my observations, and, this may come bite me,

---

[9](...continued)
statements  because he's not "too good at figuring different things." [Tr. 236 - 237].

but he's a very proud person. He's a very productive person. He has adjusted well in society. If his nursing home closes down, if the, if the, church closes down, if his environment changes then, of course, he may not be able to adapt to something brand new, but he, he's almost living the kind of life that we all dream about. I mean, he's, he's loved. You have some good friends. You have a church that, that you look to. You have a job that you, that you can do, and - - I mean, you - - there's a lot about this individual that's just almost the salt of the earth. I'm almost embarrassed to - - if, if I were to make a determination to put him on disability. It would almost destroy him. There's limitations, obviously, in the future, and I think maybe that's what we have to look at. But as of right now, this is a proud individual, and, you know, he graduated from high school. He was not - - we don't have any kind of a historical basis to show that he has any kind of special ed. I would, for his own self-dignity, I, would be very hesitant to, to order a consultative examination. It would almost be an embarrassment.

[Tr. 248 - 249].

The record includes a copy of an Appeal Brief, with attachments, faxed by

Plaintiff's counsel to the Appeals Council on May 3, 2005 [Tr. 200 - 210].[10] Counsel advised that after receiving the ALJ's unfavorable decision, Plaintiff's family obtained private testing to evaluate the level of Plaintiff's mental functioning [Tr. 202]. The attached report from licensed professional counselors reflects that Plaintiff achieved the following scores on the Wechsler Adult Intelligence Scale - Third Edition: Verbal IQ of 70; Performance IQ of 65; and, Full Scale IQ of 66, placing him in the Extremely Low classification of intellectual abilities [Tr. 208]. The following observation was made by the counselors:

> Mr. Mathey lives with his sister. According to him, he also loves and depends on his brother for advice and help with decisions. Mr. Mathey makes a good first impression, however from the results of testing and observations he needs much support to do work and to make most all life decisions.

[Tr. 209].

## Substantial Gainful Activity

There is no dispute between the parties that Plaintiff's earnings – unless subsidized[11] – from the time of his alleged onset of disability date through the date of his

---

[10]The record further reflects that the Appeals Council considered the additional evidence but found that it did not provide a basis for changing the ALJ's decision and denied review [Tr. 4 - 5]. The ALJ's decision is, consequently, the Commissioner's final decision.

[11]See 20 C.F.R. § 404.1574 (a) provides that several guides are used to determine whether work done by a claimant shows that the claimant is able to do substantial gainful activity. As further explained:

> We consider only the amounts you earn. When we decide whether your earnings show that you have done substantial gainful activity, we do not consider any income that is not directly related to your productivity. When your earnings exceed the reasonable value of the work you perform, we consider only that part of your pay which you actually earn. If your earnings are being subsidized, we do not consider the amount of the subsidy when we determine if your earnings show that you have done substantial gainful activity. We consider your work to be subsidized if the true value of your work, when compared with the same or similar work done by unimpaired persons, is less than the actual amount of

(continued...)

administrative hearing were sufficient to establish that he was engaging in substantial gainful activity and, accordingly, was not disabled.   Likewise, if Plaintiff's earnings were subsidized to the extent alleged, there is no question – and the Commissioner does not argue otherwise – that the substantial gainful activity threshold would not be met.

To establish that his salary was subsidized, Plaintiff offered documentation from his employer, Ayers Nursing Home, stating that his work was actually worth less than fifty percent of the amount he was paid [Tr. 98 - 101]. The ALJ found that Plaintiff's salary was not, in fact, subsidized. The question for determination here is whether that decision by the ALJ is supported by substantial evidence.

Prior to the hearing in this matter, the Social Security Administration contacted the Ayers Nursing Home, asking that Plaintiff's direct supervisor complete a questionnaire designed to determine whether Plaintiff's employment was subsidized [Tr. 100 - 101].[12] Plaintiff's employer was instructed that "[a] subsidy exists when an employer willingly pays more in wages that the value of the actual services performed," and was further advised that "[t]his is usually for humanitarian reasons." [Tr. 100]. The letter to the nursing home also explained that, "A subsidy can be reflected by giving the employee . . . full wages for lower quality or quantity than standard, or . . . fewer and/or easier duties than usual for that position." *Id.*

---

[11](...continued)
earnings paid to you for your work.

20 C.F.R. § 404.1574 (a) (2).

[12]*See generally* Social Security Ruling 83-33, 1983 WL 31255.

The nursing home responded to the Administration's request both with a letter and by completing the questionnaire.  The questionnaire asks, first, whether the employer considered Plaintiff's "work to be fully worth the amount paid." [Tr. 98].  The employer responded by checking "No" where indicated and was then directed to "please estimate the actual value of his/her services, if possible, and explain how you reached that figure." *Id.*  The form instructed that this estimate was to be expressed either by a percentage figure or in dollars. *Id.*  The employer provided the requested valuation, estimating that the actual value of Plaintiff's services was less than fifty percent of his salary. *Id.*  The employer then explained, as requested, how this figure was reached: Plaintiff never mastered some of his assigned jobs; he had to be given fewer and easier duties; extra staff was required to perform duties assigned to Plaintiff; Plaintiff is unable to handle many tasks; and, changes confuse Plaintiff. *Id.*  The nursing home did not reach the third step of the questionnaire because the form instructs that if an estimate has been provided, the final portion of the questionnaire is not to be completed. *Id.*

Mike Ayers also provided a letter to the Administration, explaining that Plaintiff was a friendly, well-liked individual who has difficulty learning tasks and whose ability to perform jobs has diminished [Tr. 99].  Mr. Ayers stated that the nursing home employed Plaintiff, feeling it to be their social responsibility, and because he would be unable to secure other employment. *Id.*

The ALJ found the nursing home's valuation estimate of less than fifty percent to be unsupported [Tr. 22].  Specifically, the ALJ found that the nursing home made "no attempt to explain how such figure (of 50 percent) was reached, as requested." *Id.*  This,

14

as detailed above in reviewing the nursing home's response to the questionnaire, is simply not correct and is not substantial evidence in support of the ALJ's no-subsidy determination.  Next, the ALJ employs the testimony of the Plaintiff to undercut the explanatory statements offered by the nursing home in support of the percentage valuation.  He states that Plaintiff never testified that he required special transportation, fewer hours, frequent absences and/or special equipment.  *Id.*  The nursing home, however, did not advance these factors in explanation for their estimate so the ALJ's finding in this regard is not relevant.  The ALJ then points to the statement by the nursing home that Plaintiff had to be given fewer duties and that extra staff was needed to perform his responsibilities.  *Id.* He compared that statement with Plaintiff's testimony that he was able to keep up with his current work and that he had not been admonished by his supervisors to work more quickly; he also noted the absence of testimony by Plaintiff that other staff members were required to do his work [Tr. 22 - 23].  Not only does it stand to reason that an employer fulfilling what it believed to be a social responsibility to a well-liked individual would not admonish him for his shortcomings, but Plaintiff's testimony is entirely consistent with the nursing home's explanation: One of Plaintiff's initially assigned duties was bed making, but he could not accomplish that task in a timely manner [Tr. 227], and he is no longer performing that function [Tr. 233 - 234].  Once again, substantial evidence does not support this finding by the ALJ.

The ALJ's final determination with respect to the nursing home's subsidy valuation is that it is not credible [Tr. 23].  In this regard, the ALJ found that "it is not so clear that the accommodation actually provided to the claimant is not in the form of exaggerating

the degree of problems the claimant has in performing his work." *Id.* Absolutely *no* evidence, however, is cited by the ALJ in support of his conclusion that the nursing home would fabricate, or exaggerate, a subsidy estimate to benefit Plaintiff. This is nothing but a speculative conclusion on the part of the ALJ and is analogous to an ALJ's improper rejection of a treating physician's opinion. *See McGoffin v. Barnhart*, 288 F.3d 1248, 1252 (10th Cir. 2002) (an ALJ can reject a treating physician opinion only in reliance on contradictory medical evidence and not in reliance on his own credibility judgment or speculation). Even when an ALJ is evaluating the credibility of a claimant whom he has had the opportunity to personally evaluate, his findings must be linked to evidence in the record. *See* Social Security Ruling 96-7p, 1996 WL 374186, at *2. Plaintiff's employer has affirmatively advised the Social Security Administration that his salary is subsidized; the ALJ's finding – that the nursing home's statement is not true because it is only attempting to accommodate Plaintiff by exaggerating his work-related problems – is not supported by *any* evidence in the record but is, instead, pure speculation on the part of the ALJ.

Substantial evidence does not support the ALJ's finding that Plaintiff's salary was not subsidized to the extent estimated by the nursing home and, consequently, the ALJ's finding at step one of the sequential evaluation that Plaintiff was engaging in substantial gainful activity is, likewise, unsupported by substantial evidence. The ALJ, however, did not conclude his analysis at step one but continued by determining at step four that Plaintiff was not disabled due to his ability to perform his past relevant work [Tr. 25]. Plaintiff maintains, in part, that the ALJ failed at step four to determine the physical and

mental demands of his past relevant work and to then determine whether, in light of his RFC, Plaintiff has the present ability to meet those demands. *See Winfrey v. Chater*, 92 F.3d 1017, 1023 (10th Cir. 1996). The Commissioner argues that while the ALJ must typically engage in this evaluation, "where, as here, a claimant continues to work in a job constituting SGA, common sense would dictate that it is unnecessary for the ALJ to engage in an analysis of the claimant's RFC or the demands of his past relevant work." [Doc. No. 15, p.9].[13] Because the ALJ's finding that Plaintiff's work constitutes substantial gainful activity is not supported by substantial evidence, the Commissioner's argument at step four, likewise, fails, and it is recommended that the ALJ's decision be reversed and the matter remanded for further proceedings, including a proper evaluation of Plaintiff's mental impairment at step three of the sequential evaluation. *See Clifton v. Chater*, 79 F.3d 1007 (10th Cir. 1996).

## RECOMMENDATION AND NOTICE OF RIGHT TO OBJECT

For the foregoing reasons, it is recommended that this matter be reversed and remanded for further proceedings in accordance with this report. The parties are advised of their right to object to this Report and Recommendation by August __6__, 2006, in accordance with 28 U.S.C. §636 and Local Civil Rule 72.1. The parties are further advised that failure to make timely objection to this Report and Recommendation waives their right to appellate review of both factual and legal issues contained herein. *Moore v. United States*, 950 F.2d 656 (10th Cir. 1991). This Report and Recommendation

---

[13]The Commissioner does not claim that the ALJ engaged in the required evaluation of Plaintiff's other previous jobs.

disposes of all issues referred to the Magistrate Judge in this matter.

ENTERED this _/2_ day of July, 2006.

BANA ROBERTS
UNITED STATES MAGISTRATE JUDGE